[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 11, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-12910

_____

D. C. Docket Nos.
06-01236-CV-ORL-19 & 03-04926-JAF

BRUCE LEE JENNINGS,

Debtor.

_____

BRUCE LEE JENNINGS,

Plaintiff-Appellant,

versus

BRANDON JAMES MAXFIELD,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(July 11, 2008)**

Before BIRCH and FAY, Circuit Judges, and RODGERS,[*] District Judge.

PER CURIAM:

Bruce Lee Jennings ("Jennings") appeals from a 13 June 2007 order in which the district court affirmed the bankruptcy court's judgment and order under 11 U.S.C. § 727(a)(2)(A) denying Jennings's discharge. After he was found liable in a California civil action, but before damages had been awarded, Jennings transferred $130,000 to a builder in anticipation of improvements to be made on a hangar located on his Florida property. The bankruptcy court and district court found that Jennings made the transfer with the intent to hinder, delay, or defraud creditors. Jennings argues that the courts below erred in denying his discharge because he lacked the requisite fraudulent intent, and because the legislative history of the Bankruptcy Code states that a debtor may convert non-exempt assets to exempt assets prior to filing bankruptcy in order to make full use of available exemptions. After a review of the record and the parties' briefs, and having the benefit of oral argument, we conclude that the bankruptcy court and the district court did not clearly err in finding that Jennings made this payment with the intent to hinder, delay, or defraud his creditors. Accordingly, we AFFIRM.

_____

[*] Honorable Margaret C. Rodgers, United States District Judge for the Northern District of Florida, sitting by designation.

2

# I. BACKGROUND

Jennings is the sole shareholder of B.L. Jennings, Inc. ("B.L. Jennings"), a firearms distributor. He also served as a consultant to Bryco Arms ("Bryco"), a handgun manufacturer, and was involved in Bryco's daily operations. Bryco primarily sold its handguns to B.L. Jennings. On 6 April 1994, plaintiff-appellant Brandon James Maxfield ("Maxfield") was paralyzed in an accidental shooting involving a handgun designed by Jennings, manufactured by Bryco, and distributed by B.L. Jennings. The accident occurred several days after Bryco's insurance policy lapsed; neither Jennings nor B.L. Jennings maintained insurance.

Maxfield filed a civil action in California Superior Court against Bryco and B.L. Jennings in May 2001, and he added Jennings as a defendant in October 2001, alleging that Jennings had defectively designed the handgun that injured him. The California court divided the case into three phases, the first to determine liability, the second to establish damages, and the third to address joint venture, enterprise, partnership, and alter ego issues. The liability phase was set to begin on 17 March 2003.

In January 2002, Jennings met with a bankruptcy attorney in Boca Raton, Florida. Jennings testified that the purpose of this meeting was to obtain estate-planning advice, but he conceded that no wills or trust agreements were prepared

3

during the first three months of 2002.[1]  R.Exhs.7, Pl.'s Exh. 146 at 173.  On 29

January 2002, Jennings made an offer to purchase a property in Spruce Creek, a

community in Daytona Beach, Florida, for $925,000.  The property contained both

a house and a hangar adjacent to the house.  The offer was accepted, and the

transaction closed on 15 February 2002.  Thereafter, Jennings spent over $84,000

refurbishing his house.[2]

In November or December 2002, Jennings decided to expand the hangar

adjacent to his house.  He hired Baker Builders to perform the construction.  On 10

March 2003, Jennings signed a notice of commencement to enlarge the hangar.

The next day, Frank Baker ("Baker"), the president of Baker Builders, prepared a

construction cost summary sheet, which he gave to Jennings to explain the

expenses to be incurred during the construction of the hangar.  The construction

summary sheet described and estimated the cost of each aspect of the project and

estimated the total cost of the project at approximately $202,000.  Jennings and

Baker Builders signed a contract on 31 March 2003, which provided, in part, that

---

[1] After further discussions with his attorney in February, Jennings purchased a $500,000 annuity on 5 March 2002.  The bankruptcy court found this purchase was a fraudulent transfer, because Jennings purchased the annuity with the intent to hinder, delay, or defraud his creditors.

[2] The bankruptcy court concluded that these expenditures were incurred "to make [the house] more comfortable for living purposes, not to keep it out of the hands of creditors." Bankr. Ct. Dkt. No. 145 at 21.

"capital for the construction expenses will be paid in increments of Fifty Thousand Dollars ($50,000) and a complete accounting of those funds will be presented before any additional capital will be funded." R.Exhs.5, Pl.'s Exh. 85 at 2. A few days later, Jennings gave Baker Builders a check in the amount of $5,000 as a prepayment on the first $50,000 due under the contract. That amount was sufficient to allow Baker Builders begin initial work on the project. R.Exhs.5, Pl.'s Exh. 91 at 32.

On 21 April 2003, the California court concluded the liability phase of the trial and found Jennings 15 percent liable, B.L. Jennings 10 percent liable, and Bryco 10 percent liable. R.Exhs.4, Pl.'s Exh. 22 at 5. On 23 April 2003, Jennings traveled to Europe, aware of the liability verdict against him. He returned from Europe on 4 May 2003 and expected to see that the site preparation work for the hangar expansion project was complete, but it was not. Jennings was "very anxious" to move the project along, so either that evening or the next day, Jennings called Baker to ask why the work had not been done. R6-80 at 69. Baker told Jennings that "[Baker] hadn't obligated himself and that I hadn't given him the funds to go forward." Id. Based upon their telephone conversation, Jennings concluded "the reason [] that [Baker] hadn't done work on the house while I was gone, or should I say the hangar project, was because he hadn't received moneys

5

sufficient to start doing the concrete work." Id. at 69-70.

On 5 May 2003, Jennings withdrew $130,000 from his account at Bank of America to purchase a $130,000 cashier's check payable to Baker Builders. The contract did not require payments to be made using cashier's checks, but Jennings explained that he hand-delivered the cashier's check to Baker, because he wanted to "save a week or so of waiting for checks to clear." Bankr. Ct. Dkt. No. 75 at 82. As of that date, Baker Builders had spent less than $700 on the hangar project, leaving untouched most of the $5,000 prepayment Jennings delivered previously in April. R.Exhs.5, Pl.'s Exh. 89 at 1. In fact, Baker Builders would not begin clearing the hangar property until June, at a cost of approximately $3,000.

On 7 May 2003, the California court entered a damages verdict of approximately $50 million. On 13 May 2003, the California court entered a judgment against Jennings in the amount of $21,250,650.31.[3] On 14 May 2003, Jennings, Bryco, and B.L. Jennings, and other defendants in the California litigation filed voluntary Chapter 11 bankruptcy petitions.

On 9 April 2004, the bankruptcy court held a hearing on Maxfield's objection to Jennings's claimed exemptions. According to Jennings's testimony at

---

[3] In a subsequent order dated 25 September 2003, the bankruptcy court awarded Maxfield pre-judgment interest and costs, increasing the damages award to $24,492,578.47. R.Exhs.4 at Pl.'s Exh. 25.

the hearing, he and Baker negotiated the $130,000 payment as a way for Jennings "to save money and move the project forward." R.Exhs.7, Pl.'s Exh. 147 at 91. Jennings testified that:

> [Baker] and I had a meeting, and . . . it was decided that, if I would pay him the money that he was about ready to spend, he could . . . get the project going if he had the money in his hand, and he could negotiate better pricing and be prepared to move the project forward faster, and possibly even get some discounts on our work because we were well funded and ready to go.

Id. at 91-92. When Jennings was asked why he did not pay any more than $130,000, he said that "what [Baker] and I negotiated was only 130." Id. at 92.

Baker was deposed on 27 July 2004, and his deposition testimony directly contradicted Jennings's testimony at the April hearing before the bankruptcy court. Baker testified that Jennings independently determined the $130,000 figure, with no input from Baker.[4] R.Exhs.5, Pl.'s Exh. 91 at 36-38. In contrast to Jennings's testimony that he and Baker negotiated the $130,000 payment, Baker testified that, after the initial $50,000 payment called for by the contract, he expected to receive additional money only after he had spent the first $50,000 and provided an accounting of the expenditures to Jennings. Yet before the site had been cleared

---

[4] This appears to comport with Jennings's testimony at trial in the bankruptcy court, where he stated that he arrived at the $130,000 figure by calculating what it would cost to complete the walls, roof, and windows, so that the hangar would not be damaged by wind and rain. R6-80 at 70.

7

and the permit had been issued, Jennings paid Baker the first two installments in full and more than half of the third installment. According to Baker, Jennings told Baker: "'Hey, I got – I'm going to California, I might not be back for two months, I'm going to give you $130,000.'" Id. at 37. As to Jennings's rationale for paying $130,000, Baker surmised: "maybe because he didn't have $150,000 or whatever. I mean, I don't know how he got to the 130 figure but he thought that would be enough money to carry me during the time period he would be away." Id. at 37-38. Baker denied that he ever suggested to Jennings that Jennings would save any money by prepaying the $130,000 and denied that he requested Jennings to pay $130,000 for any reason. Id. at 45-46.

The bankruptcy court held a trial on Maxfield's objection in July and August 2005. At trial, Jennings testified that he knew that the contract with Baker Builders required only an initial payment of $50,000, but he gave Baker $130,000 because he "did not want to be burdened with the management of costs and supervision of a hangar" while preparing for the damages phase of the California trial. Bankr. Ct. Dkt. No. 75 at 83. He also wanted to indicate to Baker that he was "sincere in getting [the] hangar started" and to ensure that Baker would be able to begin construction on the hangar. Id. at 82. The bankruptcy court denied Jennings's request for a discharge under 11 U.S.C. § 727(a)(2)(A) based on his $130,000

8

transfer to Baker Builders.  The district court affirmed, and this appeal followed.

## II.  DISCUSSION

On appeal, the parties dispute whether Jennings made the $130,000 transfer to Baker Builders with intent to hinder, delay, or defraud his creditors, and whether the record contains sufficient evidence to deny Jennings a discharge under § 727(a)(2)(A) because of that transfer.  Jennings contends that the transfer was made in order to utilize the homestead exemption available to him under Florida law, not to keep the money from his creditors, and he maintains that such a transfer is permissible "even if it is made prior to bankruptcy with the intent to keep the money from creditors."  Appellant's Br. at 21.  Jennings's position creates apparent tension between the Bankruptcy Code's legislative history, which states that it is not fraudulent for a debtor to convert non-exempt assets to exempt assets prior to filing bankruptcy, and our application of § 727(a)(2)(A) of the Bankruptcy Code in this case.  However, any such tension is resolved by our conclusion that a debtor can convert non-exempt assets to exempt <u>unless</u> he is motivated to make such a conversion by an actual intent to hinder, delay, or defraud his creditors.

As the Tenth Circuit has stated, "[o]ne of the more difficult issues in bankruptcy law is deciding when, if ever, an intent to defraud creditors can be shown by the debtor's conversion of nonexempt assets to exempt assets."  <u>In re</u>

Warren, 512 F.3d 1241, 1249 (10th Cir. 2008).  This question is even more difficult where, as here, the debtor has attempted to utilize a statutory homestead exemption.  See In re Smiley, 864 F.2d 562, 568 (7th Cir. 1989) (noting that debtor's intent to defraud creditors was not immediately apparent because he attempted to avail himself of legal exemptions).  Both the bankruptcy court and the district court found that Jennings intended to hinder, delay, or defraud his creditors by transferring $130,000 to Baker Builders before it was due under the contract.  Accordingly, the courts below denied Jennings a discharge under § 727(a)(2)(A).  We review for clear error the bankruptcy courts's factual determination that a debtor intended to hinder, delay, or defraud a creditor.  In re Wines, 997 F.2d 852, 856 (11th Cir. 1993).  We must accept the bankruptcy court's factual findings if they are affirmed by the district court, unless they are clearly erroneous.  Id.  Deference to the bankruptcy court's findings is "particularly appropriate" because the intent determination will often depend on that court's "assessment of the debtor's credibility."  In re Krehl, 86 F.3d 737, 743 (7th Cir. 1996).  "When the district court has affirmed the bankruptcy court's findings . . . we will apply the clearly erroneous doctrine with particular rigor."  In re Wines, 997 F.2d at 856 (quotation and citation omitted).

The Bankruptcy Code favors discharge of an honest debtor's obligations.

In re St. Laurent, 991 F.2d 672, 680 (11th Cir. 1993).  The general policy that provisions denying such a discharge are construed liberally in favor of the debtor and strictly against the creditor applies only to the honest debtor.  Id.  Indeed, the legislative history to the 1978 revision of the Code states that "[a]s under current law, the debtor will be permitted to convert non[-]exempt property into exempt property before filing a bankruptcy petition.  The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law."  H.R. Rep. No. 595 95th Cong., 1st Sess. 361 (1977) reprinted in 1978 U.S. Code Cong. & Admin. News 5963, 6317 (citation omitted); S. Rep. No. 989, 95th Cong. 2d Sess. 76, reprinted in 1978 U.S. Code Cong. & Admin. News 5787, 5862.  However, there are limitations to a debtor's ability to avoid his debts.  A debtor can be denied a discharge under § 727(a)(2)(A) of the Bankruptcy Code where property of the debtor is transferred by the debtor or with the debtor's permission within one year of the filing of the bankruptcy petition, and the transfer was made with the intent to hinder, delay, or defraud a creditor.  11 U.S.C. § 727(a)(2)(A).  A party who objects to a discharge has the burden to prove the objection by a preponderance of the evidence.  Grogan v. Garner, 498 U.S. 279, 289-91, 111 S. Ct. 654, 661 (1991).  To successfully object to a discharge under § 727(a)(2)(A), a creditor must establish (1) that the act complained of was done

within one year prior to the date the petition was filed, (2) with actual intent to hinder, delay, or defraud a creditor, (3) that the act was that of the debtor, and (4) that the act consisted on transferring, removing, destroying, or concealing any of the debtor's property.  11 U.S.C. § 727(a)(2)(A).  Once the creditor has met this burden, "[t]he debtor must bring forward enough credible evidence to dissuade the court from exercising its jurisdiction to deny the debtor discharge based on the evidence presented by the objecting party" In re Prevatt, 261 B.R. 54, 58 (Bankr. M.D. Fla. 2000).

Since it is unlikely that a debtor will admit that he intended to hinder, delay, or defraud his creditors, the debtor's intent may be established by circumstantial evidence or inferred from the debtor's course of conduct.  In re Krehl, 86 F.3d at 743.  Courts have identified several indicia of fraud that tend to show that a debtor had an actual intent to defraud his creditors.  They include:

> (1) the lack or inadequacy of consideration for the property received;
> (2) the nature of the relationship between the transferor and the transferee;
> (3) whether the transferor retains possession, control, benefits, or use of the property in question;
> (4) whether the transfer resulted in insolvency;
> (5) the cumulative effect of the debtor's transactions and course of conduct after the onset of financial difficulties or threat of suit by creditors; and
> (6) the general chronology and timing of the transfer in question.

In re Marrama, 445 F.3d 518, 522 (1st Cir. 2006).

12

The evidence adduced at the hearing on Maxfield's objection established that nine days before filing for bankruptcy, and after having been found liable for Maxfield's injuries, Jennings hand-delivered Baker Builders a cashier's check for $130,000. Jennings independently determined this amount, which was $85,000 more than the contract obligated Jennings to pay at the time, and which was well in excess of the value of the services Baker Builders yet had rendered. Perhaps most important to the bankruptcy court was Jennings's testimony at the April 2004 hearing. Jennings had testified that he negotiated the terms and purposes of the accelerated payment with Baker, but Jennings's testimony was contradicted by Baker, and the bankruptcy court found Jennings's non-fraudulent explanations for the transfer to be not credible. Specifically, the bankruptcy court discredited Jennings's statements that (1) the $130,000 transfer was made to ensure the hangar project would start immediately; (2) Jennings would save money on the cost of the hangar project by prepaying a larger portion of the total project cost; (3) he and Baker negotiated the terms of the accelerated payment of $130,000; and (4) Jennings made the payment so that he would not be burdened by the project while attending his trial in California. Further, the bankruptcy court determined that Jennings began "seriously contemplating" filing for bankruptcy after the date of the liability verdict, 21 April 2003, and discounted Jennings's testimony that he

13

decided to file for bankruptcy only after the California court's entry of the damages verdict on 7 May 2003, two days after the transfer at issue here. Bankr. Ct. Dkt. No. 145 at 20. Since the bankruptcy court did not believe Jennings's proffered explanations for his $130,000 payment to Baker Builders, the bankruptcy court concluded that Jennings intended "to keep the money out of the hands of his creditors rather than to jump start or to save money on the project." Id.

Although the bankruptcy court was attentive to the timing of the transfer at issue, it was Jennings's lack of candor in his testimony, not the sequence of events, that was of paramount importance to the bankruptcy court's determination that Jennings made the transfer with the intent to hinder, delay, or defraud his creditors. The bankruptcy court pointed out that the timing and circumstances surrounding Jennings's payment to Baker Builders confirmed its suspicions that the payment was motivated by concerns other than the pace and cost of the hangar project. However, the bankruptcy court did not rely solely on the circumstances to determine Jennings's intent. Id. at 19-21. The district court agreed, finding "first and foremost" that Jennings's "less than candid . . . testimony" regarding the transfer constituted sufficient extrinsic evidence upon which to base a finding of actual fraudulent intent. Dist. Ct. Dkt. No. 21 at 11. In addition, the district court found that the record evidence supported the bankruptcy court's determination that

14

"the timing of the transaction and Jennings'[s] unilateral decision concerning the amount of funds to transfer pointed to a wrongful intent." Id.

We conclude that the bankruptcy court did not clearly err in finding that Maxfield presented sufficient evidence in support of his objection to bar Jennings's discharge based on the $130,000 transfer to Banker Builders. Jennings did not attempt to conceal from his creditors the transfer to Baker Builders, but the bankruptcy court found that his innocent business-related explanations for the transfer were not credible and concluded that he made the transfer with actual intent to hinder, delay, or defraud his creditors. The bankruptcy court was in the best position to assess Jennings's credibility and disbelieved his testimony. After our review of Jennings's testimony, we find that the bankruptcy court had ample justification for doing so, and we are not appropriately situated to second-guess the bankruptcy court's decision regarding Jennings's credibility.

We agree with the courts below that Jennings's lack of candor is of great significance in determining his intent, because we do not think that the sequence of events preceding the transfer is sufficient, by itself, to establish that Jennings intended to hinder, delay, or defraud his creditors by increasing the value of his protected homestead. Even though the timing of Jennings's transfer coincided with the California court's verdicts on liability and damages, the bankruptcy court

15

became convinced that Jennings intended to shield his money from creditors because Jennings's proffered "innocent" explanations for the transfer were contradicted by Baker. After discrediting Jennings's non-fraudulent motivations, the bankruptcy court reasonably concluded that Jennings must have been motivated by an intent to hinder, delay, or defraud his creditors. We note our agreement with the bankruptcy court that Jennings's desire to move the project along may have justified completing the initial $50,000 payment required by the contract, but not a $130,000 payment; as Baker testified at his deposition, the contract would have required Jennings to make the initial $50,000 payment soon after the contract was executed. We find that Jennings's decision to falsify his motives for prepaying an additional $85,000 is indicative of his actual fraudulent intent and is an additional piece of evidence leading us to conclude that the entire transfer was made with the intent to prevent the money from reaching his creditors. When considering the timing and sequence of events in this case along with Jennings's testimony, we conclude that the record provides ample evidence to support the bankruptcy court's judgment that Jennings transferred $130,000 to Baker Builders with actual intent to hinder, delay, or defraud his creditors.[5]

---

[5] Since we have determined that the record evidence supports a finding that Jennings intended to defraud his creditors, we express no opinion as to whether the discharge would have been proper if Jennings had intended only to hinder or delay his creditors.

16

Since Jennings attempted to take advantage of the Florida homestead exemption, we have carefully examined the record to determine that sufficient evidence supports the bankruptcy court's conclusion that Jennings intended to defraud his creditors. See In re Smiley, 864 F.2d at 569. We recognize that Jennings claims to have made this transfer in order to take full advantage of the Florida homestead exemption, but we agree with the bankruptcy court that Jennings's actual intent was to utilize the homestead exemption in order to hinder, delay, or defraud his creditors. The text of the Code expressly provides for a denial of a debtor's discharge where the debtor transfers property within one year before filing a petition with intent to hinder, delay, or defraud his creditors. Such a denial is appropriate in this case, because we concur with the bankruptcy and district courts's conclusion that Jennings intended to hinder, delay, or defraud his creditors through the transfer of money into his homestead, not simply to convert non-exempt assets to exempt assets. Therefore, we conclude that Jennings's fraudulent intent warranted the denial of discharge under § 727(a)(2)(A).

### III. CONCLUSION

Jennings appeals from the denial of his discharge under § 727(a)(2)(A) based on the grounds that he made a $130,000 transfer with the intent to "hinder, delay, or defraud a creditor." We conclude that the record contains ample evidence

17

of Jennings's actual intent to defraud his creditors by making a premature payment on a contract for improvements to part of his Florida homestead. Jennings unilaterally determined the amount of the payment, which greatly exceeded the amount then due under the contract, Jennings realized no savings and received no other benefit as a result of the payment, almost no work had been done on the project when the payment was made, and Jennings could not convincingly explain the rationale behind his decision to make the payment. Accordingly, the bankruptcy court correctly denied Jennings a discharge because he intended the transfer to hinder, delay, or defraud his creditors.

**AFFIRMED**.