[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10560
_____

D.C. Docket No. 9:12-cv-80750-KMM,
Bkcy No. 09-01839-EPK


In re:   HARLEY N. KANE,

                                                          Debtor.
_____

HARLEY N. KANE,
CHARLES J. KANE,

                                                          Plaintiffs - Appellants,

versus

STEWART TILGHMAN FOX & BIANCHI PA,
TODD S. STEWART, P.A.,
WILLIAM C. HEARON, P.A.,

                                                          Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 26, 2014)

Before MARCUS, Circuit Judge, and PROCTOR[*] and EVANS,[**] District Judges.

MARCUS, Circuit Judge:

This bankruptcy appeal concerns whether two debtors (Charles Kane and Harley Kane) may discharge in Chapter 7 bankruptcy a $2 million judgment entered by a Florida state court in favor of the creditors (Stewart Tilghman Fox & Bianchi, P.A., William C. Hearon, P.A., and Todd S. Stewart, P.A.). The case requires us to answer two questions. First, Charles Kane and Harley Kane appeal the district court's order affirming the bankruptcy court's judgment excepting the state court judgment from discharge under 11 U.S.C. § 523(a)(6). According to the appellants, the bankruptcy court mistakenly characterized the state court judgment as a nondischargeable debt "for a willful and malicious injury by the debtor." Separately, Harley Kane appeals the denial of his discharge by joint application of 11 U.S.C. § 727(a)(7) and 11 U.S.C. § 727(a)(2), arguing that the bankruptcy court erroneously found that he transferred or concealed the property of an "insider" entity with the intent to hinder, delay, or defraud the appellees. Finding no error, we affirm.

I.

---

[*] Honorable R. David Proctor, United States District Judge for the Northern District of Alabama, sitting by designation.

[**] Honorable Orinda Evans, United States District Judge for the Northern District of Georgia, sitting by designation.

In a bankruptcy appeal, we review a bankruptcy court's fact-finding for clear error only.  See In re Piazza, 719 F.3d 1253, 1260 (11th Cir. 2013).  "When the district court has affirmed the bankruptcy court's findings . . . we will apply the clearly erroneous doctrine with particular rigor."  In re Jennings, 533 F.3d 1333, 1338 (11th Cir. 2008) (quoting In re Wines, 997 F.2d 852, 856 (11th Cir. 1993)).  Additionally, when we examine the facts adduced at trial, generally we will not disturb a bankruptcy court's credibility determinations.  See In re Englander, 95 F.3d 1028, 1030 (11th Cir. 1996) (requiring a reviewing court to "give due regard" to a bankruptcy court's credibility judgments); see also United States v. Peters, 403 F.3d 1263, 1270 (11th Cir. 2005) (recognizing that "[a]ssessing witness credibility is uniquely the function of the trier of fact").  Here, to the extent the appellants dispute the relevant facts, they rely exclusively on evidence drawn from their own testimony, which the bankruptcy judge expressly disbelieved.  Notably, at this stage, the appellants have provided us with no basis for disturbing the bankruptcy court's assessment of their credibility.  Thus, in summarizing the essential facts developed over the course of a six-day hearing in the bankruptcy court, we accept as we must the bankruptcy court's factual findings in light of its credibility judgments.

A.

3

The essential facts and procedural history are straightforward.  The appellants, Charles Kane and his son, Harley Kane, are attorneys licensed to practice in Florida.  They were the only partners in a law firm formed as a general partnership and known as Kane & Kane (the "Kane Firm").  Before 2002, the Kanes and the Kane Firm, in collaboration with attorneys Laura Watson, Darren Lentner, Amir Fleischer, and Gary Marks, and their respective law firms (all of the foregoing, together with the Kanes, the "PIP Lawyers"), filed thousands of claims (collectively, the "PIP Litigation") in Florida on behalf of an estimated 441 healthcare provider clients (the "PIP clients") against the Progressive Insurance Companies ("Progressive") under the personal injury protection ("PIP") provisions of many policies issued by Progressive.  All of the PIP Lawyers, including the Kanes, were jointly retained by all of the plaintiffs in the PIP Litigation on a contingent-fee basis.

In order to increase their leverage against Progressive in the PIP Litigation, the PIP Lawyers decided to pursue derivative claims grounded in Progressive's alleged bad faith refusal to settle the PIP claims (the "Bad Faith Litigation"). Lacking relevant experience and resources, the PIP Lawyers could not press these bad faith claims on their own.  The PIP Lawyers therefore sought help from Stewart Tilghman Fox & Bianchi, P.A., William C. Hearon, P.A., and Todd S. Stewart, P.A. (collectively, the "appellees" or the "Stewart Firms"), whose

4

members, including lead attorney Larry Stewart, would pursue the Bad Faith

Litigation on a parallel front along with the PIP Litigation.

The PIP Lawyers jointly drafted a contingent fee agreement with the Stewart

Firms.  Initially, and in writing, the parties specifically limited the scope of the

Stewart Firms' involvement to the Bad Faith Litigation alone.  The parties agreed

that the Stewart Firms would receive sixty percent of all attorneys' fees collected

from the Bad Faith Litigation.  Over time, the Stewart Firms and the PIP Lawyers

entered into engagement agreements with approximately thirty-six plaintiffs in the

Bad Faith Litigation.  As Larry Stewart testified in bankruptcy court, however, the

plan had always been to "add plaintiffs in . . . the future."  Thus, the bankruptcy

court found that the Stewart Firms "effectively represented the interests of all of

the clients in the PIP Litigation."  In fact, as the bankruptcy judge observed, the

evidence "overwhelmingly" established that the Kanes and the Stewart Firms

treated the PIP Litigation and the Bad Faith Litigation as being "inextricably

intertwined."

From 2002 to 2004, the Stewart Firms vigorously litigated the bad faith

claims and obtained several favorable rulings.  According to the bankruptcy court,

the favorable rulings in the Bad Faith Litigation motivated Progressive to consider

settling all of the bad faith claims held by all of the plaintiffs in the PIP Litigation.

On January 21, 2004, Larry Stewart made an offer to Progressive to settle the

5

universe of potential bad faith claims for $20 million.  Later, Progressive countered at $2 million.  Ultimately, Progressive and the Stewart Firms scheduled a formal mediation for April 2004.

Progressive hoped for a sweeping mediation.  Before the scheduled date, Progressive requested that the parties discuss at mediation not only the existing and potential bad faith claims, but also the PIP claims presented in the PIP Litigation. Though the Stewart Firms had until that time prosecuted only the bad faith claims, Larry Stewart agreed to address the PIP claims too, subject to obtaining: (1) authority from the PIP Lawyers, and (2) an agreement from Progressive to discuss the bad faith claims first.  Stewart insisted on this sequence in part to avoid a conflict of interest between the clients and their counsel.  The PIP Litigation and the Bad Faith Litigation involved substantially different contingent fee structures: the clients would receive only about ten percent of any recovery in the PIP Litigation, while they were entitled to sixty percent of any recovery on the bad faith claims.

On April 13, 2004, shortly before the mediation with Progressive, Larry Stewart met with the Kanes to strategize.  At that meeting, the Kanes authorized Stewart to discuss with Progressive all of the claims held by all of the clients in the PIP Litigation, including both the PIP claims and any existing or potential bad faith claims.  In consideration of the Stewart Firms' newly expanded authority, the PIP

6

Lawyers, including the Kanes, agreed in writing to modify the Stewart Firms' compensation structure. Under the original fee agreement, the Stewart Firms were entitled to twenty-four percent of any recovery on the bad faith claims (sixty percent of the forty percent allocated to attorneys' fees), while the PIP Lawyers would receive sixteen percent of any bad faith recovery. After April 13, 2004, the Stewart Firms were entitled to thirty percent of any recovery on the bad faith claims (seventy-five percent of the attorneys' fees), while the PIP Lawyers were set to receive only ten percent of that recovery. By contrast, at all relevant times, the PIP Lawyers were entitled to ninety percent of any proceeds derived from the PIP Litigation, the PIP clients were set to receive ten percent of any PIP recovery, and the Stewart Firms would earn nothing from the PIP claims.

At the April 19, 2004 mediation, which Larry Stewart handled for the PIP clients, Progressive offered to settle the universe of existing and potential bad faith claims for $3.5 million. Stewart countered at $18.5 million. The parties did not reach an agreement at this mediation, and the Stewart Firms transmitted the news to the PIP Lawyers. In an e-mail, Larry Stewart communicated to the PIP Lawyers that the mediation had been "bizarre," that "Progressive was not dealing in good faith," and that "we told them that this was a unique opportunity." Nevertheless, Stewart noted in that e-mail that "Progressive asked the mediator to remain involved." Some of the PIP Lawyers (although not the Kanes) immediately

7

responded to Stewart's email, commending him for a job well done and asking him "to please keep [his] foot on the throat of Progressive." The Stewart Firms immediately scheduled more hearings in the Bad Faith Litigation.

Approximately four weeks after the mediation with Progressive, on the weekend of May 14 to May 16, 2004, the Kanes and the other PIP Lawyers secretly settled all litigation against Progressive -- the claims raised in the PIP Litigation, the claims raised in the Bad Faith Litigation, and any potential bad faith claims held by clients in the PIP Litigation -- for approximately $14.5 million (the "Secret Settlement"). According to the Kanes, Progressive had specifically requested that Larry Stewart not be present during the settlement discussions. The Secret Settlement was memorialized in a document called the Memorandum of Understanding (the "MOU"). The MOU allocated no portion of the aggregate settlement amount to the bad faith claims, though it earmarked more than $10.9 million for attorneys' fees and costs related to the PIP claims. Because the Stewart Firms' compensation was tied exclusively to the bad faith claims, the MOU apportioned no funds whatsoever to the Stewart Firms. At more than $4.1 million, by contrast, the Kanes' share of the Secret Settlement was the largest one-time gross fee they had ever received.

Larry Stewart first learned of the existence of the Secret Settlement -- but not its terms -- two days after the settlement meeting. The PIP Lawyers, including

8

the Kanes, refused to provide the settlement documents, or even reveal the terms of the Secret Settlement, claiming that they were prohibited from doing so under the terms of the settlement itself.  The Stewart Firms moved the state court to compel the PIP Lawyers to tender the settlement documents.  The state court then held a temporary injunction hearing and ordered the PIP Lawyers to produce the documents.  Only then, six weeks after the settlement meeting, were the Stewart Firms able to confirm that the Secret Settlement had left them holding an empty bag.

On June 16, 2004, the PIP Lawyers entered into an Amended Memorandum of Understanding (the "AMOU"), again without the knowledge or consent of the Stewart Firms.  The AMOU arbitrarily allocated $1.75 million out of an aggregate settlement amount of $14.455 million to settle the claims presented in the Bad Faith Litigation.  Thus, under the AMOU, the Stewart Firms would receive $525,000 (thirty percent of $1.75 million).  That sum was just a fraction of the amount offered only weeks before by Progressive during the April mediation.  Tellingly, both the MOU and the AMOU included specific provisions pursuant to which the PIP Lawyers agreed to indemnify Progressive against any claims of the Stewart Firms for attorneys' fees.

In a letter drafted primarily by Charles Kane, the PIP Lawyers notified the clients in the Bad Faith Litigation that the Stewart Firms and the PIP Lawyers

disagreed over the terms of the settlement of their bad faith claims. According to Charles Kane's later testimony in the bankruptcy court, the fee dispute between the Stewart Firms and the PIP Lawyers was not about the Stewart Firms' entitlement to fees, but rather about the amount of fees that the Stewart Firms would receive. In any case, the PIP Lawyers terminated the Stewart Firms' engagement, appeared in the Bad Faith Litigation as counsel for the plaintiffs, and voluntarily dismissed the bad faith claims. As the bankruptcy court characterized these actions, "the [Kanes] and the other PIP Lawyers pulled the rug out from under the [Stewart Firms]."

## B.

Following discovery of the Secret Settlement, the Stewart Firms filed suit against the PIP Lawyers in the Circuit Court for the Fifteenth Judicial Circuit of Florida (the "state court action"). On April 24, 2008, after a lengthy bench trial, the state court entered judgment in favor of the Stewart Firms and against the Kanes and the Kane Firm, jointly and severally, in the amount of $2 million, plus prejudgment interest, on theories of quantum meruit and unjust enrichment. The state court judgment was upheld on appeal, in its entirety, by an order entered February 29, 2012. Kane v. Stewart Tilghman Fox & Bianchi, P.A., 85 So.3d 1112 (Fla. 4th DCA 2012).

The Kanes and the Kane Firm had filed voluntary Chapter 11 petitions with the bankruptcy court on November 17, 2008 (the "Chapter 11 proceeding"). The Stewart Firms moved to dismiss the Chapter 11 cases. On March 20, 2009, after an evidentiary hearing, the bankruptcy court dismissed all three Chapter 11 cases, both orally and memorialized in a written order, as having been filed in bad faith. In addition, the court ordered that prior to the effective date of dismissal (March 30, 2009), the Kane Firm was authorized to pay only for goods and services delivered or rendered to the firm in the ordinary course of business. Also on March 20, 2009, the bankruptcy court entered another order specifically restricting distributions from the Kane Firm to the Kanes until the dismissal order took effect. All of these orders were served electronically on counsel for the Kanes on March 20, 2009. Two business days later, Harley Kane violated the bankruptcy court's orders by causing the Kane Firm to pay approximately $30,000 in satisfaction of his personal real estate tax obligations.

Subsequently, on March 30, 2009, each of the Kanes and the Kane Firm filed voluntary Chapter 7 petitions with the bankruptcy court (the "Chapter 7 proceeding"). On July 31, 2009, the Stewart Firms filed adversary complaints against both Kanes, asserting claims for, inter alia: (1) exception from discharge of the state court judgment under 11 U.S.C. § 523(a)(6), which renders nondischargeable any debt "for willful and malicious injury by the debtor to

11

another entity or to the property of another entity"; and (2) denial of discharge under § 727(a)(7) and § 727(a)(2), which when taken together bar a debtor's discharge where the debtor has transferred the property of an "insider" entity with the intent to hinder, delay, or defraud a creditor.[1]

On November 7, 9, and 10, 2011, and January 20, 23, and 24, 2012, the bankruptcy court conducted an extensive hearing to ventilate the appellees' adversary claims.[2]  Ultimately, the bankruptcy court entered judgment: (1) in favor of the Stewart Firms and against both Kanes for exception from discharge under § 523(a)(6); and (2) in favor of the Stewart Firms and against Harley (but not Charles) Kane for denial of discharge under § 727(a)(7), by application of § 727(a)(2) in a bankruptcy case concerning an insider.  Additionally, although the Stewart Firms did not assert a denial of discharge claim under § 727(a)(6), see 11 U.S.C. § 727(a)(6) (barring discharge where a debtor refuses to obey a lawful order of the court), the bankruptcy court held that the issue had been tried by consent of all parties and ruled in favor of the Stewart Firms and against Harley (but not

---

[1] The Stewart Firms also brought separate adversary claims against the Kanes under 11 U.S.C. § 727(a)(2) (applied directly, not in conjunction with § 727(a)(7)), § 727(a)(5), and § 523(a)(4). The bankruptcy court adjudicated these claims in favor of the Kanes, and the Stewart Firms did not appeal.

[2] With the consent of the parties, the bankruptcy court held a single hearing because the adversary proceedings were identical and based on the same underlying facts.

Charles) Kane on this claim too.  The Kanes appealed these rulings to the district court.

After consolidating the Kanes' appeals, the district court affirmed the bankruptcy court's application of § 523(a)(6) and its joint application of § 727(a)(7) and § 727(a)(2).  Moreover, because the district court affirmed the bankruptcy court's determination that Harley Kane's discharge was barred by § 727(a)(7) and § 727(a)(2) applied together, the district court declined to review the bankruptcy court's alternative ruling that Harley Kane's discharge could also be barred pursuant to § 727(a)(6).

The Kanes timely appealed to this Court.

## II.

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition."  In re Mitchell, 633 F.3d 1319, 1326 (11th Cir. 2011) (citing 11 U.S.C. § 727(b)).  But "this 'fresh start' policy is only available to the 'honest but unfortunate debtor.'"  Id. (quoting In re Fretz, 244 F.3d 1323, 1326 (11th Cir. 2001)).  "To ensure that only the honest but unfortunate debtors receive the benefit of discharge, Congress enacted several exceptions to § 727(b)'s general rule of discharge."  Id.

On appeal, the Kanes again challenge the bankruptcy court's application of several discharge exceptions.  First, the Kanes jointly claim that the bankruptcy

court wrongfully excepted the state court judgment from discharge under 11 U.S.C. § 523(a)(6), because, they assert, the state court judgment did not arise from a "willful and malicious injury." In the second place, Harley Kane argues that the bankruptcy court wrongfully denied his discharge by joint application of § 727(a)(7) and § 727(a)(2), since he claims not to have transferred the assets of the Kane Firm with the intent to hinder, delay, or defraud the Stewart Firms. We are not persuaded by either argument.

## A.

According to the terms of 11 U.S.C. § 523(a)(6), a bankruptcy court may prevent a debtor from discharging any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). In reviewing a bankruptcy court's judgment, we independently examine the bankruptcy court's factual findings for clear error and review de novo the legal conclusions of both the bankruptcy and district courts. In re JLJ Inc., 988 F.2d 1112, 1116 (11th Cir. 1993). A bankruptcy court's determination that an injury was "willful and malicious" is a factual finding that we review only for clear error. See Chrysler Credit Corp. v. Rebhan, 842 F.2d 1257, 1264 (11th Cir. 1988), abrogated on other grounds by Grogan v. Garner, 498 U.S. 279 (1991). Moreover, in a bankruptcy court, a creditor must prove the applicability of § 523(a)(6) by a preponderance of the evidence. Grogan, 498 U.S. at 291. Thus, on appeal, we

14

review <u>de novo</u> any legal interpretation of the terms "willful" and "malicious," but we review only for clear error the bankruptcy court's finding that a creditor showed a willful and malicious injury by a preponderance of the evidence.

"A debtor is responsible for a 'willful' injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." <u>In re Jennings</u>, 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting <u>In re Walker</u>, 48 F.3d 1161, 1165 (11th Cir. 1995)) (alteration omitted); see <u>Kawaauhau v. Geiger</u>, 523 U.S. 57, 61-62 (1998) (holding that § 523(a)(6) requires the actor to intend the injury, not just the act that leads to the injury). Our sister circuits have disagreed about whether the term "substantial certainty" is a subjective standard, requiring a creditor to prove that a debtor actually knew that the act was substantially certain to injure the creditor, or an objective standard, requiring a creditor to show only that a debtor's act was in fact substantially certain to cause injury. <u>Compare</u> <u>In re Ormsby</u>, 591 F.3d 1199, 1206 (9th Cir. 2010) (requiring creditor to show that "debtor believes that injury is substantially certain to result from his own conduct"), <u>with</u> <u>In re Shcolnik</u>, 670 F.3d 624, 630 (5th Cir. 2012) (finding willfulness where creditor showed an "objective substantial certainty of harm"). This Court has never had occasion to parse that distinction, and we need not do so today. Even applying the more stringent, subjective standard, the evidence presented amply supports the bankruptcy court's finding

15

that the Kanes intentionally committed acts that they knew were substantially certain to injure the Stewart Firms.

The direct evidence adduced in the Chapter 7 hearing established at least this much: (1) the Kanes acted intentionally in negotiating, structuring, and documenting the Secret Settlement that originally awarded the Stewart Firms no fees and ultimately allocated just over $500,000 to them; (2) the Kanes intentionally excluded the Stewart Firms from the settlement negotiations with Progressive that were conducted on a weekend and in secret; (3) the Kanes acted intentionally in forcing the Stewart Firms out of the Bad Faith Litigation; and (4) the Kanes intentionally implemented the Secret Settlement after forcefully recommending its acceptance to their clients.

The evidence amply supports the bankruptcy court's finding that the Kanes knew their conduct was substantially certain to injure the Stewart Firms.  For starters, they do not dispute that, at all relevant times, the Stewart Firms were entitled to some compensation.  Moreover, the Kanes understood that the Stewart Firms' compensation depended entirely on the settlement amount that was allocated to the bad faith claims, and therefore they knew that the Stewart Firms were substantially certain to suffer material injury if no funds were set aside to redress those claims.  Finally, the Secret Settlement contained a provision according to which the PIP Lawyers agreed to indemnify Progressive for any

16

claims of attorney's fees asserted by the Stewart Firms.  In fact, Charles Kane admitted at trial that he knew, on the very day he agreed to the Secret Settlement, that the Stewart Firms would assert a claim.  The preponderance of this evidence amply supports the determination that the Kanes knew their conduct was substantially certain to injure the Stewart Firms.  Thus, the bankruptcy court did not clearly err in finding that the state court judgment arose from a "willful" injury committed by the Kanes against the Stewart Firms.

On appeal, the Kanes argue, nevertheless, that their actions were not "willful" because "the undisputed evidence reflects that the [Kanes] did not control the allocation of fees between the Bad Faith litigation and the PIP lawsuits. Settlement could only be accomplished with the approval of the clients.  They approved the allocation over the objection of the Stewart Law Firms."  Appellant's Br. at 29.  This argument is entirely derived from the testimony of Charles Kane, which the bankruptcy court discredited.  Moreover, as the bankruptcy court and the district court correctly observed, the Kanes cannot fairly hide behind the fact that the PIP clients -- including the plaintiffs in the Bad Faith Litigation -- ratified the Secret Settlement.  As the bankruptcy court explained,

> The [Kanes'] argument that they did not have control over allocation of the settlement amount is contrary to the greater weight of the evidence in this case.  The PIP Lawyers, including the [Kanes], negotiated and papered the Secret Settlement.  They were not compelled to sign the MOU or the AMOU.  Not only were the [Kanes] architects of the Secret Settlement, but they forcefully

17

recommended it to their clients while systematically eliminating the [Stewart Firms] from the process by, <u>inter alia</u>, not including the [Stewart Firms] in any of the negotiations and removing the [Stewart Firms] from the Bad Faith Litigation.

<u>In re Kane</u>, 470 B.R. 902, 942-43 (Bankr. S.D. Fla. 2012).

The bankruptcy court also properly determined that the injury was malicious. "'Malicious' means wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will. To establish malice, a showing of specific intent to harm another is not necessary." <u>In re Jennings</u>, 670 F.3d at 1334 (internal quotation marks and citation omitted). Put differently, for the purposes of § 523(a)(6), "[m]alice can be implied." <u>In re Thomas</u>, 288 F. App'x 547, 549 (11th Cir. 2008). The bankruptcy court correctly applied this standard to find, based on a preponderance of the evidence, that each of the Kanes "acted not merely to pad his own pocket but with ill will toward the [Stewart Firms]."

In the first place, the bankruptcy court was free to imply malice because the preponderance of the evidence establishes that the Kanes committed acts that were "wrongful and without just cause." The release of the bad faith claims, which the Stewart Firms had pressed, was one of the principal considerations for the Secret Settlement. Nevertheless, when Progressive asked the PIP Lawyers to exclude Larry Stewart from the settlement talks, the Kanes silently complied with this odd request and participated in the meeting anyway. Both Kanes assisted in crafting the one-sided Secret Settlement, though at least Charles Kane knew that the

18

Stewart Firms were hoping to settle the Bad Faith Litigation for around $12 million.  The Kanes also knew that Progressive had previously offered the Stewart Firms $3.5 million to settle only the Bad Faith Litigation, and that Larry Stewart had rejected that offer.  Still, the Kanes and the other PIP Lawyers initially structured the settlement to allocate zero dollars to the Bad Faith Litigation (and ultimately allocated only $1.75 million to the Bad Faith Litigation).  The bankruptcy court did not err in finding no just cause for this arbitrary allocation that enriched the Kanes and undeniably and materially injured the Stewart Firms.

Moreover, Charles Kane all but admitted that the challenged conduct was wrongful and unjustified.  Thus, for example, he testified during the Chapter 7 hearing that he had never been comfortable with the indemnity provision in the MOU.  The Kanes half-heartedly argue that circumstances justified their decision to marginalize the Stewart Firms, since Progressive allegedly refused to negotiate with Larry Stewart.  But even Charles Kane acknowledged that this explanation was unpersuasive.  From his testimony we learn that, even in the moment, the secrecy of the settlement did not "feel right."  In fact, according to his testimony, Charles Kane actually considered calling Larry Stewart at one point during the settlement negotiations.  In light of all of the evidence, we cannot say the bankruptcy court clearly erred in observing that the Kanes' "after-the-fact attempt

19

to explain away these alarming aspects of the Secret Settlement was patently self-serving."

Finally, the trial court was free to imply malice because the preponderance of the evidence establishes that the Kanes committed wrongful acts that were "excessive." The Stewart Firms aimed to settle the Bad Faith Litigation for about $12 million, and, indeed, even the $3.5 million settlement offer that Larry Stewart rejected in April would have generated $1,050,000 for the Stewart Firms. Nevertheless, the Kanes and the other PIP Lawyers initially structured the settlement to allocate zero dollars to the Bad Faith Litigation. This attempt utterly to obliterate any compensation to the Stewart Firms -- which had worked substantially on the bad faith claims -- was both excessive and egregious. Moreover, the PIP Lawyers, including the Kanes, sought to conceal the very terms of the deal, initially refusing to provide the settlement documents or disclose the terms of the MOU. Indeed, the Stewart Firms were forced to obtain a court order compelling the PIP Lawyers to tender the Secret Settlement documents. The Kanes' efforts to cover their tracks were excessive too. The cumulative effect of this evidence was, as the bankruptcy court and the district court observed, "overwhelming." In the face of this evidential foundation, the bankruptcy court's determination that the Kanes inflicted a "willful and malicious injury" on the Stewart Firms was not clearly erroneous.

20

The Kanes argue, however, that there can be no showing of a "willful and malicious injury" under § 523(a)(6) without an independent and additional showing of an "intentional, tortious act."  We reject this claim for two reasons: first, the statute contains no language specifically calling for an independent showing of tortious conduct, see 11 U.S.C. § 523(a)(6) (excepting from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity"); moreover, neither the Supreme Court nor this Court has ever introduced any such requirement.

According to the Kanes, the Supreme Court's decision in Kawaauhau, 523 U.S. 57, recognized an independent tort requirement implicit in § 523(a)(6).  That claim is unpersuasive for additional reasons.  The Kanes have misread Kawaauhau. It is true that the Supreme Court characterized the Eighth Circuit decision under review in Kawaauhau as having "confined" the § 523(a)(6) exception to debts "based on what the law has for generations called an intentional tort."  Kawaauhau, 523 U.S. at 60.  In context, however, that observation, which the Supreme Court quoted directly from the Eighth Circuit's opinion, invokes the concept of an "intentional tort" for a limited purpose.  The analogy to intentional torts merely emphasizes that § 523(a)(6) requires a creditor to show that a debtor "intended" the consequences of his actions:

> We therefore think that the correct rule is that a judgment debt cannot
> be exempt from discharge in bankruptcy unless it is based on what the

21

law has for generations called an intentional tort, a legal category that is based on the consequences of an act rather than the act itself. Unless the actor desires to cause consequences of his act, or . . . believes that the consequences are substantially certain to result from it, he or she has not committed an intentional tort.

Geiger v. Kawaauhau, 113 F.3d 848, 852 (8th Cir. 1997) (internal quotation marks and citation omitted).  Nothing in Kawaauhau requires us actually to determine whether a debtor technically committed a tort under applicable state law.

Moreover, our binding precedent announced after Kawaauhau has made no mention of any independent tort requirement bundled into § 523(a)(6).  In In re Jennings, a panel of this Court invoked the same standard for malice that we had applied at least twice before in the § 523(a)(6) context.  See In re Jennings, 670 F.3d at 1334; In re Walker, 48 F.3d 1161; In re Thomas, 288 F. App'x 547; see also In re Williams, 337 F.3d 504, 510 (5th Cir. 2003) ("[A] knowing breach of a clear contractual obligation that is certain to cause injury may prevent discharge under Section 523(a)(6), regardless of the existence of separate tortious conduct.").  The Kanes marshal no arguments compelling us to change our settled approach.

In short, the bankruptcy court did not clearly err in concluding that the state court judgment arose from a "willful and malicious injury" by the Kanes, and therefore the bankruptcy court correctly allowed the Stewart Firms, under 11 U.S.C. § 523(a)(6), to prevent the Kanes from discharging the state court judgment.

22

B.

Harley Kane also appeals the bankruptcy court's denial of his discharge under: (1) the joint application of § 727(a)(7) and § 727(a)(2); and (2) § 727(a)(6).[3] The bankruptcy court's § 727(a) rulings were premised on its finding that Harley Kane, on March 24, 2009, diverted certain funds from Kane Firm accounts to pay his own personal real estate taxes. Plainly, these transfers were in violation of the orders entered by the bankruptcy court on March 20, 2009, which dismissed the Kane Firm's Chapter 11 case effective March 30, 2009, and restricted all distributions from the Firm to the Kanes before that date. Because we affirm the bankruptcy court's determination that Harley Kane's discharge is barred pursuant to § 727(a)(7) and § 727(a)(2), we need not address the bankruptcy court's alternative holding that Kane's discharge would also be barred under § 727(a)(6). See In re Protos, 322 F. App'x 930, 932-33 (11th Cir. 2009) ("A finding against the Appellant under any single subsection of section 727 is sufficient to deny him a discharge." (citing 11 U.S.C. § 727 (using the disjunctive "or"))).

Section 727(a)(7) authorizes a denial of discharge in the debtor's personal bankruptcy case if the debtor committed any act specified in paragraph (a)(2) through (a)(6) of § 727 in connection with another bankruptcy case "concerning an

---

[3] While § 523(a)(6) renders nondischargeable any debt specifically arising from a willful and malicious injury by the debtor, misconduct triggering § 727(a)(2)-(7) more broadly prevents a debtor from discharging otherwise dischargeable debts.

23

insider." 11 U.S.C. § 727(a)(7). More precisely, § 727(a)(7) provides in relevant part:

> The court shall grant the debtor a discharge, unless . . . the debtor has committed any act specified in paragraph (2) . . . of this subsection, on or within one year before the date of the filing of the petition, or during the case, in connection with another case, under this title or under the Bankruptcy Act, concerning an insider.

11 U.S.C. § 727(a)(7). The act forbidden by § 727(a)(2) is the making of transfers of property with the intent to hinder, delay, or defraud creditors. Specifically, § 727(a)(2) states:

> The court shall grant the debtor a discharge, unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . property of the debtor, within one year before the date of the filing of the petition; or . . . property of the estate, after the date of the filing of the petition.

Id. § 727(a)(2).

Although we have never had occasion to construe 11 U.S.C. § 727(a)(7), we think the statute is clear. To prevail on a claim invoking § 727(a)(7) and § 727(a)(2) together, a creditor must establish that (1) an insider relationship exists, and that (2) within one year of the filing of the debtor's personal bankruptcy case, (3) there was a transfer, removal, destruction, mutilation, or concealment, (4) of the property of the insider or of the estate of the insider, (5) by the debtor, (6) with the intent to hinder, delay, or defraud the insider's creditors. Other circuits have

24

applied § 727(a)(7) in this straightforward way.  See, e.g., In re Watman, 458 F.3d 26, 31-35 (1st Cir. 2006); In re Krehl, 86 F.3d 737, 741-44 (7th Cir. 1996).

Here, the bankruptcy court properly determined that Harley Kane's misconduct in the Kane Firm's Chapter 11 case barred his own discharge in Chapter 7 pursuant to § 727(a)(7) and § 727(a)(2) taken together.  There is no dispute that the Kane Firm is an "insider" with respect to Harley Kane.  The term "insider" under the Bankruptcy Code is defined at 11 U.S.C. § 101(31).  Where, as here, the debtor is an individual, the term "insider" encompasses a "partnership in which the debtor is a general partner."  Id. § 101(31)(A)(ii).  Harley Kane was one of two general partners in the Kane Firm; the Kane Firm is his insider.  Moreover, Harley Kane caused the Kane Firm to pay his personal real estate taxes amounting to some $30,000 on March 24, 2009, only six days before he filed his personal bankruptcy petition.  He does not dispute that a transfer occurred, nor does he challenge at this stage the bankruptcy court's finding that he transferred property of the Kane Firm.

Finally, the bankruptcy court found that Harley Kane caused the Firm to pay his personal real estate tax obligations with the intent to hinder, delay, or defraud the Stewart Firms.  "We review for clear error the bankruptcy court's factual determination that a debtor intended to hinder, delay, or defraud a creditor."  In re Jennings, 533 F.3d at 1338.  "Deference to the bankruptcy court's findings is

25

particularly appropriate" in this context "because the intent determination will often depend on that court's assessment of the debtor's credibility." Id. (internal quotation marks omitted). On this record, we find no clear error in the bankruptcy court's assessment of Harley Kane's intent. To block a debtor's discharge pursuant to § 727(a)(2), a creditor is not required to adduce direct evidence of a debtor's bad intent. Id. at 1339. "Since it is unlikely that a debtor will admit that he intended to hinder, delay, or defraud his creditors, the debtor's intent may be established by circumstantial evidence or inferred from the debtor's course of conduct." Id. Here, the bankruptcy court's determination of Harley Kane's bad intent was amply supported by circumstantial evidence and inferences drawn from that evidence.

On May 20, 2009, the record in the Chapter 11 proceeding revealed a telling colloquy between counsel and the bankruptcy court. Harley Kane's attorney asked the bankruptcy court to delay the effectiveness of the order dismissing the Chapter 11 petitions of Harley Kane, Charles Kane, and the Kane Firm, claiming that the Kanes needed time to unwind their practice. Counsel for the Kanes explained that, once the dismissal order took effect, the Kanes "would anticipate the garnishment" of the Kane Firm's accounts by the Stewart Firms, leaving the Kanes with "no funds to pay anything." In response, counsel for the Stewart Firms expressed concern about the "bad faith dissipation of assets" that might occur in the interim.

The bankruptcy court delayed the effectiveness of the order until March 30, but it authorized the Kane Firm to pay only those expenses incurred in the ordinary course of business. Furthermore, the court specifically prohibited distributions to the Kanes without a separate court order.

Two business days later, Harley Kane caused the Kane Firm to pay his personal real estate taxes. Notably, he never brought the tax payments to the attention of the bankruptcy court. Rather, the court only learned of the contested transfers when the Chapter 7 trustee for the Kane Firm filed an adversary proceeding to recover them. Moreover, when the tax collector agreed to settle the adversary proceeding by paying to the Chapter 7 trustee for the Kane Firm the entire amount received by the tax collector, the Kanes and the Kane Firm objected to the settlement. Against all of this evidence of bad intent, Harley Kane offers only his own testimony to argue that: (1) he did not know the transfer was prohibited, and (2) he contacted the bank to reverse the payments once he realized his mistake.[4] But, the bankruptcy court found Harley Kane not to be credible. There was no clear error in the bankruptcy court's finding that Harley Kane "knew of" the bankruptcy court's May 20 ruling and "caused the Firm to pay his personal

---

[4] Harley Kane also claims that the tax payments were "preferential transfers," which allegedly cannot form the basis of a claim under § 727(a)(7). See 11 U.S.C. § 547 (defining preferences). Like the district court, we decline to address this argument because Harley Kane did not raise it in his initial brief below. See Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 972 (11th Cir. 2008) ("It is well settled in this circuit that an argument not included in the appellant's opening brief is deemed abandoned.").

real estate tax obligations with the intent to hinder and delay the [Stewart Firms]." The evidence supports the inference drawn by the trial judge that Harley Kane -- anticipating the garnishment of the Kane Firm's accounts -- appropriated the Firm's funds while he still could.  Thus, the bankruptcy court properly denied Harley Kane's discharge pursuant to § 727(a)(7) and § 727(a)(2) when read in concert.[5]

**AFFIRMED.**

---

[5] On appeal, the Kanes also claim that the bankruptcy court improperly gave collateral estoppel effect in the Chapter 7 adversary proceeding to certain facts established in: (1) a related state court action, and (2) a related Chapter 11 proceeding.  As the bankruptcy court repeatedly observed, however, the facts given preclusive effect served only to bolster the evidence directly adduced over the course of a consolidated six-day hearing in the Kanes' Chapter 7 cases.  The bankruptcy court was careful to explain that the evidence established at the Chapter 7 hearing was independently sufficient to ground its legal conclusions.  We agree, and thus we decline to address the Kanes' collateral estoppel argument.