[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11389

_____

In re: STANLEY KAPPELL WATSON,

Debtor.

_____

STANLEY KAPPELL WATSON,

Plaintiff-Appellant,

*versus*

SHENEKKA BRADSHER,
ZARINAH ALI,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:22-cv-04996-SEG,
Bkcy No. 1:18-bk-69905-BEM

_____

Before WILLIAM PRYOR, Chief Judge, and LUCK and BRASHER, Circuit Judges.

WILLIAM PRYOR, Chief Judge:

This appeal requires us to decide whether debts from judgments for false imprisonment are nondischargeable in bankruptcy because they are "for willful and malicious injury." 11 U.S.C. § 523(a)(6). Stanley Watson, a former county commissioner, falsely accused two women of stealing his wallet, repeatedly demanded their arrest, and threatened police officers who refused to cooperate. After the women sued Watson for slander, battery, and false imprisonment, a jury returned a general verdict against him for $150,500. Watson then petitioned for bankruptcy, and the women sued to except their judgments from discharge. The bankruptcy court found that Watson "genuinely believed" that the women stole his wallet and that the battery was accidental, so it discharged his judgment debts for battery and slander. But it ruled that the judgment debts for false imprisonment were nondischargeable. Because the bankruptcy court committed no clear error in finding that Watson willfully and maliciously caused the women's confinement, we affirm.

## I. BACKGROUND

This appeal is about a man who lost his wallet and, shortly after, his solvency. We begin with the wallet. We then turn to his bankruptcy.

On July 12, 2012, Stanley Watson, a DeKalb County Commissioner, entered the Tanqueray Lounge in Decatur, Georgia, and saw Sheneeka Bradsher sitting at the bar. Watson eventually joined Bradsher, bought her a few drinks, and invited her to "come home with [him]." When Bradsher declined his invitation, Watson responded, "[y]ou don't know who I am," before shifting tactics and remarking that she "look[s] like [she] like[s] nice things" and that "everything has a price." Feeling "insulted" by Watson's proposition, Bradsher replied, "[W]hat do I look [like] going home with [you]?" She then called Watson "big" and "greasy" and said that he "look[ed] like Bookman from *Good Times*," before joining her friend Zarinah Ali elsewhere in the Lounge.

Watson became "very angry" and tried to close his tab but could not find his wallet. After questioning two bartenders—neither of whom had seen his wallet—Watson became convinced that Bradsher took it. He accused Bradsher and Ali of stealing his wallet by repeating that those "bitches stole my wallet."

A Tanqueray employee approached Perez Patterson and off-duty police officer Sergeant Oscar Parker, who were providing security, to convey Watson's accusations. By that point, each had already interacted with Watson. When Patterson attempted to pat

Watson down upon his arrival, Watson asserted that "he did not get patted down because he was a county commissioner." Although Patterson asserted that he neither knew nor recognized Watson, his shirt identified him as a county commissioner, and "he felt his job was threatened by [Watson's] comments." Parker had a similar encounter. When Parker asked Watson to move his car because it blocked the Lounge's exit, Watson asked why Parker could not move it himself and reminded the sergeant that he was the only one "trying to get you[ ]all raises." Parker replied that he "was not a valet," and Watson moved his car.

During a conversation with Parker about the missing wallet, Watson explained that it had been in his back pocket and that he placed it on the bar to pay his tab. He admitted that he had not seen Bradsher take his wallet but insisted that "th[o]se bitches got my wallet." He repeatedly demanded Bradsher's and Ali's arrest and threatened to have the bar shut down if the officers did not comply.

Parker next spoke with Bradsher and Ali. Both women allowed Parker to search their purses, and neither contained Watson's wallet. Watson nevertheless accused Ali of having his wallet, speculating that if Bradsher did not have it, she must have passed it to Ali. When Ali denied the accusation, Watson allegedly poked Ali on the forehead, accused her again, and told her that she would go to jail.

At this point, the officers took Watson, Bradsher, and Ali outside and separated them. But an "intoxicated," "belligerent,"

and "irate" Watson continued to insist that Bradsher and Ali had stolen his wallet and demanded their arrest. A video recorded by Patterson shows Watson saying, "[T]hey know they got my wallet." It also captured Watson threatening to call various people, including the police chief, that the bar would lose its food certification, and that its employees would lose their jobs.

Meanwhile, Bradsher, angered by the accusations, began using profanity. Parker arrested her for disorderly conduct, handcuffed her, and placed her in a police car. He explained that his decision to arrest her was based on her conduct and not Watson's allegations, but Bradsher had not been disorderly before the accusations.

While Bradsher sat in the police car, Watson approached the window and repeated that she had stolen his wallet. Watson kept saying, "Bitch stole my wallet. She is going to have to give me my fucking wallet." He walked back and forth alongside the police car, asserting repeatedly that she would go to jail. "[D]isturbed" by Watson's language, Parker admonished him to "behave like an elected official." But Watson continued to insist on an arrest. Because Bradsher had already been detained, the officers concluded that he wanted Ali arrested as well. The officers instructed Ali not to leave, so she remained at the scene.

Parker solicited information from Watson about his wallet and its contents for an incident report before going to his car to retrieve a body camera. In that footage, Parker explained to

Watson that he was in no condition to drive. Watson asked to return to his car to call a friend to drive him home but instead drove away himself. He briefly left the parking lot before returning when officers followed him. Soon after, a police lieutenant arrived at the bar, called a police major, and handed the phone to Watson. After Watson's conversation with the major, the lieutenant instructed Parker to allow someone to take Watson home. Parker's incident report described "circumstances beyond his control" as preventing him from arresting Watson. He also stated that he did not "feel right" arresting Bradsher in the light of Watson's behavior, so he issued a warning and released her. The next day, Watson found his wallet in his car.

Bradsher and Ali sued Watson in state court for slander *per se*, false imprisonment, and battery. A jury returned a general verdict for Bradsher and Ali. The jury awarded Bradsher compensatory damages of $75,000 and punitive damages of $5,000. It awarded Ali compensatory damages of $25,000 and punitive damages of $5,000. The court also awarded the women $39,000 in attorney's fees and $1,500 in expenses.

Watson filed a bankruptcy petition and received a discharge. But Bradsher and Ali filed an adversary complaint against Watson to except the $150,500 state-court judgment from discharge because "an individual debtor" may not be discharged "from any debt" "for willful and malicious injury by the debtor to another entity." 11 U.S.C. § 523(a)(6). After a trial, the bankruptcy court entered judgment for Bradsher and Ali in part and Watson in part. It

ruled that the judgment debts for slander and false imprisonment were nondischargeable but that the judgment debt owed to Ali for battery was dischargeable. It found that Watson did not intend to make physical contact with Ali when he poked her forehead, so the injury could not have been "willful." And it attributed $2,500 of Ali's judgment to the debt for battery.

Watson appealed the bankruptcy court's ruling that Bradsher's and Ali's judgments for slander and false imprisonment were nondischargeable. The district court affirmed in part, reversed in part, and remanded. It affirmed the judgment to the extent that "any debt arising from [Bradsher's and Ali's] false imprisonment claims is nondischargeable" but reversed and remanded because "further factual clarification [was] necessary" to determine whether the slander injury was "willful." It described the tension between the bankruptcy court's finding that Watson "genuinely believed" that Bradsher and Ali stole his wallet and its finding that Watson's slander was "willful."

On remand, the bankruptcy court found that Watson's slander was not "willful" under section 523(a)(6). Because Watson "genuinely believed" that Bradsher and Ali had stolen his wallet when he made the accusations, he "neither knew nor was substantially certain that his statements were false." It ruled that Bradsher and Ali failed to prove by a preponderance of the evidence that the debt arising from the slander claim was "willful" and ruled that the debt was dischargeable.

Because the jury had not apportioned damages by claim, the bankruptcy court determined how to allocate them. It found that two-thirds of the compensatory damages arose from their suffering false imprisonments and one-third arose from their suffering slanders. For Bradsher's compensatory damages, $50,000 was nondischargeable as attributable to the false imprisonment and $25,000 was dischargeable as attributable to the slander. For Ali's, $16,667 was nondischargeable as attributable to the false imprisonment and $5,833 was dischargeable as attributable to the slander. It used the same allocation to apportion attorney's fees and expenses and punitive damages. For the nondischargeable debts for false imprisonment, it attributed $27,000 in attorney's fees and expenses and $6,666 of the punitive damages award. For the dischargeable debts for slander and battery, it attributed $13,500 in attorney's fees and expenses and $3,334 of punitive damages.

Watson then filed his second notice of appeal. He contested the bankruptcy court's "arbitrary allocation of [the] state court damages and fees to the[] nondischargeable false imprisonment claims." The district court affirmed.

## II. STANDARDS OF REVIEW

We review the bankruptcy court's factual findings for clear error and review the legal conclusions of both the bankruptcy and district courts *de novo*. *Rush v. JLJ, Inc. (In re JLJ Inc.)*, 988 F.2d 1112, 1116 (11th Cir. 1993). We review *de novo* the interpretation of the terms "willful" and "malicious" in section 523(a)(6). *Kane v. Stewart Tilghman Fox & Bianchi P.A. (In re Kane)*, 755 F.3d 1285, 1293 (11th

Cir. 2014). But "[a] bankruptcy court's determination that an injury was 'willful and malicious' is a factual finding that we review only for clear error." *Id*. "The bankruptcy court's findings of fact are not clearly erroneous unless, in light of all the evidence, we are left with the definite and firm conviction that a mistake has been made." *Westgate Vacation Villas, Ltd. v. Tabas (In re Int'l Pharmacy & Disc. II, Inc.)*, 443 F.3d 767, 770 (11th Cir. 2005). Moreover, "when we examine the facts adduced at trial, generally we will not disturb a bankruptcy court's credibility determinations." *Kane*, 755 F.3d at 1288.

## III. DISCUSSION

We divide our discussion in two parts. First, we explain that the bankruptcy court did not clearly err when it found that Watson's debt for false imprisonment arose from a "willful and malicious injury" and was nondischargeable. *See* 11 U.S.C. § 523(a)(6). Second, we explain that the bankruptcy court did not clearly err in allocating the damages in the jury's general verdict.

### A. The Bankruptcy Court Did Not Err by Ruling that Watson's Debts for False Imprisonment Are Nondischargeable.

"A Chapter 7 debtor is generally entitled to a discharge of all debts that arose prior to the filing of the bankruptcy petition." *United States v. Mitchell (In re Mitchell)*, 633 F.3d 1319, 1326 (11th Cir. 2011) (citing 11 U.S.C. § 727(b)). To ensure that this "fresh start" is "only available to the honest but unfortunate debtor, . . . Congress enacted several exceptions to [section] 727(b)'s general rule of discharge." *Id*. (citation and internal quotation marks omitted). One

exception provides that a debtor may not be discharged from any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6).

Watson argues that because he "genuinely believed" that Bradsher and Ali had stolen his wallet, their unlawful confinement was neither "willful" nor "malicious." "A debtor is responsible for a willful injury when he or she commits an intentional act the purpose of which is to cause injury or which is substantially certain to cause injury." *SE Prop. Holdings, LLC v. Gaddy* (*In re Gaddy*), 977 F.3d 1051, 1058 (11th Cir. 2020) (citation and internal quotation marks omitted). For an injury to be willful under section 523(a)(6), the debtor must intend both the injury and the act that led to the injury. As the Supreme Court explained in *Kawaauhau v. Geiger*, because "[t]he word 'willful' . . . modifies the word 'injury,'" section 523(a)(6) covers "only acts done with the actual intent to cause injury," not "acts, done intentionally, that cause injury." 523 U.S. 57, 61 (1998) (footnote omitted).

Although the statutory text "triggers in the lawyer's mind the category 'intentional torts,'" *id.*, liability for an intentional tort does not alone establish nondischargeability—the tort must involve an intent to cause injury. To be sure, "[i]ntentional torts," as distinguished from negligent or reckless torts, "generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id.* at 61–62 (quoting Restatement (Second) of Torts § 8A cmt. a (A.L.I. 1964)). But when a debt for an intentional tort does not involve an intent to cause injury, it may be dischargeable.

*See, e.g.*, *Williams v. Int'l Bhd. of Elec. Workers Loc. 520* (*In re Williams*), 337 F.3d 504, 510 (5th Cir. 2003) (holding that "the dischargeability of contractual debts under [s]ection 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort"); *Miller v. J.D. Abrams Inc.* (*In re Miller*), 156 F.3d 598, 603 (5th Cir. 1998) ("We hold that the label 'intentional tort' is too elusive to sort intentional acts that lead to injury from acts intended to cause injury."). A debt for the intentional tort of libel, for example, "meets the requirements of [section] 523(a)(6) for non-dischargeability when the debtor/author knows the published statements were false." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). But when a libel verdict is supported by "[m]ere reckless disregard for the truth or falsity of the statement," no "willful and malicious injury" occurs. *Id.* In other words, "debts arising from recklessly or negligently inflicted injuries do not fall within the compass of [section] 523(a)(6)," *Kawaauhau*, 523 U.S. at 64, regardless of whether the jurisdiction labels the underlying judgment as one arising from an "intentional tort."

In Georgia, the tort of false imprisonment requires proof of intent to cause injury. *Stewart v. Williams*, 255 S.E.2d 699, 701 (Ga. 1979). "The essential elements . . . for false imprisonment are a detention of the person of another for any length of time, and the unlawfulness of that detention." *Fields v. Kroger Co.*, 414 S.E.2d 703, 704 (Ga. Ct. App. 1992); *see also* GA. CODE ANN. § 51-7-20 ("False imprisonment is the unlawful detention of the person of another,

for any length of time, whereby such person is deprived of his personal liberty."). Because false imprisonment requires the defendant to act "with the intention of causing a confinement, . . . there can be no such tort as a negligent false imprisonment." *Stewart*, 255 S.E.2d at 701 (citation and internal quotation marks omitted); *see also Ridgeview Inst. v. Handley*, 481 S.E.2d 531, 533 (Ga. Ct. App. 1997); RESTATEMENT (SECOND) OF TORTS § 35 (categorizing "false imprisonment" as an intentional tort and listing intent to confine as one of its elements). "A detention need not consist of physical restraint, but may arise out of words, acts, [or] gestures, . . . which induce a reasonable apprehension that force will be used if [the victim] does not submit." *Fields*, 414 S.E.2d at 704 (citation and internal quotation marks omitted). "[I]t is sufficient if they operate upon the will of the person threatened, and result in a reasonable fear of personal difficulty or personal injuries." *Id*. at 704–05 (citation and internal quotation marks omitted).

Georgia law distinguishes between cases where a person "directly or indirectly urges a law enforcement official to begin criminal proceedings and cases where a party merely relates facts to an official who then makes an independent decision to arrest or prosecute." *Scott Hous. Sys., Inc. v. Hickox*, 329 S.E.2d 154, 156 (Ga. Ct. App. 1985). On the one hand, a person "who merely states to an officer what he knows of a supposed offense, even though he expresses the opinion that there is ground for the arrest, but without making a charge or requesting an arrest does not thereby make himself liable for false imprisonment." *Id*. (citation and internal

quotation marks omitted). On the other hand, a person "who actively instigates or procures an arrest . . . is generally regarded as the principal for whom the officer acts, and he may be liable to respond in damages." *Id*. (citation and internal quotation marks omitted). In that situation, "it is not necessary" that the person "direct the arrest in express terms"; "[i]t is sufficient" that "his conduct and acts . . . procured and directed the arrest." *Id*. (citation and internal quotation marks omitted); *see also Webb v. Prince*, 9 S.E.2d 675, 678 (Ga. Ct. App. 1940).

The bankruptcy court found that the jury's general verdict against Watson included findings of liability for causing the false imprisonments of Bradsher and Ali. Watson does not meaningfully dispute the finding that the jury assigned liability for false imprisonment. Nor does he challenge the finding that he intended Bradsher's and Ali's confinement. He argues instead that even if he had the requisite intent to commit the tort of false imprisonment, his conduct was not "willful" as a matter of federal bankruptcy law. Because he "genuinely believed" that Bradsher and Ali had stolen his wallet, Watson contends that he did not intend their *unlawful* confinement and so did not "willful[ly]" cause the "injury."

Watson erroneously assumes that false imprisonment is only "willful" if he intended both the confinement *and* its unlawfulness. But the statute requires only that the debtor "willful[ly]" cause the "injury." 11 U.S.C. § 523(a)(6). Bradsher's and Ali's confinement was the "injury," and the bankruptcy court found that Watson intended to cause it. It found that Watson intended his

accusations to cause Bradsher and Ali to be detained by the police, that he continued accusing them of stealing his wallet and insisting that they go to jail, and that he threatened adverse consequences for any officer who did not cooperate. That Watson genuinely believed that the women had stolen his wallet does not negate the fact that he willfully caused their confinement. Watson offers no authority to support his argument that the finding of "willful[ness]" requires proof of intent for every element of the intentional tort, including the unlawfulness of confinement.

To the extent that Watson's subjective understanding of the lawfulness of the confinement affects the dischargeability of his debts, that issue more appropriately falls under the malice inquiry. But his argument falls short there too. We have interpreted a "malicious" injury in section 523(a)(6) as one that is "'wrongful and without just cause or excessive even in the absence of personal hatred, spite or ill-will.'" *Maxfield v. Jennings* (*In re Jennings*), 670 F.3d 1329, 1334 (11th Cir. 2012) (quoting *Hope v. Walker* (*In re Walker*), 48 F.3d 1161, 1164 (11th Cir. 1995)). Importantly, "[t]o establish malice, 'a showing of specific intent to harm another is *not* necessary.'" *Id*. (emphasis added) (quoting *Lee v. Ikner* (*In re Ikner*), 883 F.2d 986, 991 (11th Cir. 1989)). "Constructive or implied malice can be found if the nature of the act itself implies a sufficient degree of malice." *Ikner*, 883 F.2d at 991.

The bankruptcy court did not clearly err in finding, by a preponderance of the evidence, that Watson maliciously caused Bradsher's and Ali's false imprisonments. Watson argues that his actions

were not "wrongful and without just cause or excessive" because he was only doing his "'civic duty' to report a crime." In his view, his insistence that the officers arrest Bradsher and Ali was based on his "mistaken but genuine belief" that they had stolen his wallet. But Watson's genuine belief does not foreclose the bankruptcy court's finding that his actions causing Bradsher's and Ali's confinement were both "wrongful" and "excessive." *Jennings*, 670 F.3d at 1334 (citation and internal quotation marks omitted). To be sure, his genuine belief may have foreclosed a finding of a "specific intent to harm" or of "personal hatred, spite or ill-will." *Id.* (citation and internal quotation marks omitted). But because these findings were "not necessary" to make a finding of malice, the bankruptcy court did not clearly err. *Id.* (citation and internal quotation marks omitted).

We have held that a bankruptcy court is "free to imply malice" when "the preponderance of the evidence establishes that the [debtor] committed wrongful acts that were 'excessive.'" *Kane*, 755 F.3d at 1295. The bankruptcy court did not clearly err by finding that Watson engaged in "wrongful" acts that were "excessive" when he relentlessly accused Bradsher and Ali of theft using profane and derogatory language, taunted and intimidated them with repeated threats of jail, and pressed officers to arrest them even after witnessing the officers confirm that the women were not carrying his wallet. Worse still, Watson abused his position as a county commissioner by threatening the officers' employment if his demands to arrest Bradsher and Ali were not met. True, Watson

"genuinely believed" that his wallet had been stolen by Bradsher and Ali. But after reporting his wallet missing, Watson's civic duty was done. Despite his genuine yet mistaken belief, his later actions crossed the line from "civic duty" to report a crime into "wrongful" and "excessive" conduct.

Watson argues that the bankruptcy court erred by ruling that his debts for false imprisonment were nondischargeable while ruling that his debts for slander were dischargeable. Because neither party challenges the bankruptcy court's ruling that the slander judgments are dischargeable, we need not revisit it here. We must only reconcile it with the finding that the debts for false imprisonment were for willful and malicious injuries. Watson contends that the "same underlying conduct can[not] give rise to dischargeable and nondischargeable debts." But Watson erroneously assumes that the two debts involve the same injury and require identical treatment under section 523(a)(6). As the Supreme Court explained in *Kawaauhau*, nondischargeability under section 523(a)(6) turns on whether the debtor intended the specific injury. 523 U.S. at 61. Because the "injury" for false imprisonment is distinct from the injury for slander *per se*, what matters is whether Watson intended to cause the injury for each tort. The bankruptcy court's finding that Watson did not willfully and maliciously injure Bradsher's and Ali's reputations did not foreclose its finding that Watson *did* willfully and maliciously cause their unlawful confinement.

Watson asserts that the bankruptcy court and district court improperly shifted the burden to him to prove nondischargeability.

But the record does not suggest that the bankruptcy court errone-ously placed any burden on Watson. Watson points to a footnote in the district court's opinion stating that Watson's "briefing does not distinguish between possible injuries resulting from false im-prisonment and those resulting from slander." But even if this foot-note could be interpreted as shifting a burden, it would relate only to Watson's burden in the district court to establish that the bank-ruptcy court's factual findings were clearly erroneous. *See Equitable Life Assurance Soc'y v. Sublett (In re Sublett)*, 895 F.2d 1381, 1383 (11th Cir. 1990) ("The district court in a bankruptcy appeal, like this Court itself, functions as an appellate court in reviewing the bank-ruptcy court's decision."); *Griffin v. Missouri Pac. R.R. Co.*, 413 F.2d 9, 13 (5th Cir. 1969) ("The burden of proving that the findings are clearly erroneous is, of course, on the party attacking them.").

The bankruptcy court did not err by finding that Watson "willfully and maliciously" caused Bradsher's and Ali's confine-ment. To be sure, the bankruptcy court could have weighed the evidence differently. But it did not do so, and Watson cannot satisfy his heavy burden of establishing that the bankruptcy court clearly erred.

B. *The Court Did Not Clearly Err in Allocating the Judgment Debts.*

Watson argues that the bankruptcy court erred "when it ar-bitrarily concluded that two-thirds of compensatory damages, pu-nitive damages, and attorneys' fees were attributable to the false imprisonment claim and . . . not dischargeable." Watson does not

challenge the bankruptcy court's authority to apportion damages. But he argues that the bankruptcy court's "allocation of damages among the claims" and "its methodology for such allocation" were "fundamentally flawed as unsupported by the law" and "premised upon insufficient evidence of entitlement to such damages under a claim of false imprisonment." He maintains that "[t]o the extent that any of [the] claims against Watson are nondischargeable, the case should have been remanded for further evidentiary proceedings to determine the amount of nondischargeable damages."

Again, we disagree. The bankruptcy court allocated the judgment debts based on a record of testimony and other evidence from two trials. It had the benefit of the full transcript of the state-court jury trial, which reflected the testimony of the parties and key witnesses. And it presided over a trial where it had the opportunity to hear testimony from all parties and assess witness credibility. *See Englander v. Mills (In re Englander)*, 95 F.3d 1028, 1030 (11th Cir. 1996) (explaining that the district court must "give due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses"). Although Watson argues that the bankruptcy court erred in not requesting additional evidence, what matters is whether the bankruptcy court had a sufficient record to support its findings. And it plainly did.

The bankruptcy court did not clearly err in its allocation of the judgment debts. In finding that Bradsher's and Ali's injuries for false imprisonment were more substantial than their injuries for slander, the bankruptcy court relied on testimony from Bradsher,

Ali, and two officers who responded to the underlying altercation. The bankruptcy court considered the fear, embarrassment, and shame that Bradsher felt from being confined in the back of a police car. It also found that Bradsher suffered from insomnia, depression, and paranoia caused by her false imprisonment. As for Ali, it considered that being falsely imprisoned caused her to feel "violated" and that she now suffers from stress and sleep problems. Based on this evidence, it found that the "greater harm" suffered by Bradsher and Ali was attributable to "the temporary loss of liberty resulting from the false imprisonment," not the "embarrassment resulting from the defamatory statements," and it allocated two-thirds of their damages to their judgments for false imprisonment. Because the bankruptcy court's findings are supported by two trial records and we will not disturb its credibility findings, *Kane*, 755 F.3d at 1288, it did not clearly err in its allocation of the judgment debts.

## IV. CONCLUSION

We **AFFIRM** the judgments in favor of Ali and Bradsher.